757 N.W.2d 21 (2008)
17 Neb. App. 161
Gary G. NERISON, appellant,
v.
NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, also known as NFIC of Hartford, also known as CNA Financial Corporation, et al., appellees.
No. A-08-118.
Court of Appeals of Nebraska.
October 28, 2008.
*24 John C. Fowles, of The Fowles Law Office, P.C., L.L.O., Lincoln, for appellant.
Joseph F. Gross, Jr., of Timmermier, Gross & Prentiss, Omaha, for appellees.
INBODY, Chief Judge, and MOORE and CASSEL, Judges.
MOORE, Judge.

I. INTRODUCTION
Gary G. Nerison filed a petition with the Nebraska Workers' Compensation Court against National Fire Insurance Company of Hartford (National Fire), also known as NFIC of Hartford, also known as CNA Financial Corporation (collectively CNA); Associated Contract Truckmen, Inc. (ACT); and AMS Staff Leasing, Inc.; AMS Staff Leasing, N.A., Inc.; AMS Staff Leasing, N.A., Ltd.; AMS Construction Company, Inc.; and E.A.W., Inc. (collectively AMS). Nerison, a self-employed truckdriver, sought benefits in connection with his work-related accident and injury. After the court dismissed Nerison's petition, Nerison appealed to the three-judge review panel of the compensation court, which entered an order of affirmance on review. Nerison then appealed to this court. Because we find no error, we affirm.

II. BACKGROUND
Because of the rather tangled web of contractual relationships between the defendants in this case, we first provide some general information about the nature of those relationships before providing more detailed information concerning Nerison's relationship to the various defendants and the accident and injury which prompted this action.

1. RELATIONSHIP BETWEEN AMS AND CNA
AMS is a professional employer organization headquartered in Dallas, Texas. AMS enters into contracts with client companies to provide services including preparation of payroll, tax withholding, and workers' compensation insurance coverage. Under the staff leasing agreements entered into between AMS and a client company, the employees of the client company would be considered coemployees of AMS and the client company.
National Fire is part of a group of insurance companies with a service mark of "CNA," headquartered in Chicago, Illinois, and organized under the laws of the State of Connecticut. Throughout this opinion, we have referred to National Fire and CNA collectively as "CNA," except where necessary to distinguish between the two names.
AMS negotiated with CNA for the issuance of a workers' compensation insurance policy, and a policy was issued for the period of September 1, 2000, through September 1, 2001. A new policy providing workers' compensation insurance coverage was issued for the period September 1, 2001, through September 1, 2002. The 2001-02 CNA policy listed National Fire as the insurance company and AMS as the named insured. From September 1, 2001, through at least the date of Nerison's accident in June 2002, coemployees of AMS *25 were covered by this workers' compensation policy with CNA.

2. RELATIONSHIP BETWEEN AMS AND ACT
ACT is a corporation with its principal place of business in Oklahoma City, Oklahoma. ACT obtained permission under Missouri law to form a group of truckdrivers so that the group of truckdrivers could obtain workers' compensation insurance coverage. The truckdrivers were primarily independent owner-operators who leased their trucks to various trucking companies. Some trucking companies require that workers' compensation insurance coverage be purchased by independent owner-operators. The trucking company would deduct monthly premiums from settlements with owner-operators and then forward the premiums to ACT.
In November 2000, David Brandert, the president of ACT, commenced negotiations with Chris Polk of AMS. ACT needed to find insurance for independent truckdrivers. A proposed staff leasing agreement was sent to ACT. On November 15, Brandert wrote Polk:
Thank you for faxing the [proposed staff leasing agreement]. After reading it, I feel I should document the fact that ACT is a group of self employed individuals who have combined to purchase insurance on a group basis, and as such are eligible to elect workers compensation under the sole proprietor election rules of a state with jurisdiction.
AMS and ACT entered into a staff leasing agreement beginning December 1, 2000. Another staff leasing agreement was signed, which is dated December 1, 2001. ACT was to send a list of owner-operators each month together with a monthly payment due under the staff leasing agreements. Under the staff leasing agreements, the rates for a self-employed person are based upon payroll but the amount of the payroll is fixed by each state.

3. RELATIONSHIP BETWEEN ACT AND TSA
Truckers Service Association (TSA) is a nonprofit association formed to provide insurance brokerage services for independent truckers. True North Companies, L.L.C. (True North), a group of insurance agencies, provides products to members of TSA including various kinds of insurance. In August 2000, True North agreed to purchase workers' compensation insurance coverage through ACT for members of TSA. A member of TSA would pay the workers' compensation insurance premium to TSA, and TSA would then send a list of owner-operator members to ACT with the monthly premium. ACT would then forward a list to AMS with the premium. AMS would then pay a monthly premium to CNA.

4. NERISON NEEDS INSURANCE
Nerison is a self-employed semi-tractor truck owner who leases the tractor and his services as a truckdriver to various trucking companies. Nerison has lived in Nebraska City, Nebraska, since February or March 2001.
In February 2002, Nerison began leasing his tractor and services to a company that required him to have his own "physical damage, bobtail," and workers' compensation insurance coverage. "Bobtail" insurance provides accident coverage when an owner-operator is driving a tractor but is not pulling a trailer. Prior to leasing to that company. Nerison had obtained physical damage or collision insurance and bobtail insurance, but not workers' compensation insurance, through TSA.
When Nerison needed to obtain his own workers' compensation insurance coverage, he again contacted TSA and requested *26 workers' compensation insurance. TSA sent various forms to Nerison's residence in Nebraska City, which forms Nerison completed and sent back. One of the forms allowed monthly withdrawals or charges against his credit card for workers' compensation insurance premiums, and another contained a statement indicating that Nerison was a "self employer" who elected to be covered by workers' compensation insurance, was a member of ACT, and appointed Brandert as his agent to execute and deliver all instruments necessary or required in order to obtain or cancel a program of group workers' compensation coverage. Deposition testimony from Brandert shows that although a copy of the election form was maintained by ACT, it was not forwarded to AMS or CNA.
Nerison received a document titled "CERTIFICATE OF INSURANCE" with an issue date of January 24, 2002. The certificate named Nerison as the insured party and showed workers' compensation coverage effective November 1, 2001, with the insurer "NFIC of Hartford" under the same policy number as that of the workers' compensation policy issued to AMS by CNA. Nerison testified that once TSA sent back a certificate showing that he had workers' compensation insurance, the company he was leasing to was satisfied and he assumed that TSA had done everything necessary to provide him with coverage. Nerison subsequently received an updated certificate from TSA indicating a different workers' compensation insurer effective August 1, 2002.
Nerison did not read any of the documents he received from TSA, simply completing them and returning them to TSA. Nerison testified that TSA did not explain to him the means by which it would provide him with workers' compensation insurance. Nerison was not told that he was a member of ACT, and nothing was mentioned about his being a coemployee under a staff leasing agreement. From Nerison's point of view, he was just buying insurance from TSA to cover himself.
Nerison paid workers' compensation premiums to TSA through January 2003, when he began leasing to a trucking company that provided its own workers' compensation insurance coverage to its drivers.

5. THINGS FALL APART
In February 2002, CNA decided to get out of the business of insuring professional employer organizations and advised AMS that the CNA policy would not be renewed on September 1. AMS did not notify any of its clients, including ACT, that the CNA policy would expire. Problems arose between CNA and AMS, including the fact that AMS did not send CNA a complete list of all its clients. For example, although AMS reported ACT as a client company for the period of September 1, 2000, to September 1, 2001, AMS did not list ACT as a client on the monthly reports sent to CNA beginning September 2001. Apparently, AMS stopped providing lists of its clients to CNA altogether in February 2002.
On March 1, 2002, CNA wrote to AMS canceling the CNA policy effective May 10. Although AMS received the March 1 letter, it did not give notice of the cancellation to its clients. Litigation ensued between AMS and CNA. A settlement agreement was reached under which CNA was to withdraw its cancellation of the CNA policy and AMS was to formally cancel all policies with CNA as of June 20. The required cancellation letter was written by AMS to CNA on May 1.
Again, AMS did not notify its client companies that workers' compensation insurance coverage under the CNA policy *27 would end as of June 20, 2002. AMS sought other insurance coverage, but on June 20, AMS had no workers' compensation insurance. The owner of AMS later purchased a Texas insurance company, which issued a policy providing workers' compensation insurance coverage to AMS. The policy from this company was issued in August 2002 but was backdated so as to provide coverage beginning June 20.
On June 27, 2002, AMS wrote a letter informing ACT of CNA's decision to cancel the workers' compensation program. The letter stated, in relevant part:
Your workers' compensation insurance program was issued through CNA. CNA decided to cancel your workers['] compensation program. The cancellation notice will be effective July 1, 2002. The cancellation of the program will be effective July 31, 2002. Based on CNA's unfortunate action, we must cancel our [staff leasing] contract with you. This letter shall serve as our 60-day notice of cancellation.
The letter also noted that AMS was attempting to finalize an alternative to the CNA program. ACT did not receive the letter until July 19 because the letter was sent to an old address. In the meantime, on June 19, ACT sent AMS a check in payment of the May amount due under the December 2001 staff leasing agreement, and ACT submitted a list of owner-operators with the check. On July 19, 2002, Brandert at ACT was in the process of writing a similar check for June. Upon receiving the June 27 letter, Brandert destroyed the June check and did not send AMS a list of employees. ACT attempted to contact AMS after receiving the letter but was unable to speak with anyone at AMS.
Although TSA or True North sent the premium for the month of June 2002 to ACT, ACT did not send the June payment, due on July 20, to AMS. ACT notified True North and TSA that there was no insurance coverage, and True North was able to obtain alternate insurance coverage for TSA members beginning August 1.
AMS sent ACT a letter dated August 9, 2002, indicating that if ACT wished to have AMS coverage for June and July, AMS had to receive payment within 48 hours from the date of the letter, and stating that coverage in all cases concluded on July 31. ACT did not remit payments due under the December 2001 staff leasing agreement for June and July 2002.

6. NERISON'S ACCIDENT
On June 14, 2002, Nerison was driving his truck from Chicago to Houston, Texas, when he had mechanical problems. Nerison contacted a towing company to bring him and his truck to a repair facility in Morgan, Illinois. En route to Morgan, the tow truck was in an accident with another truck, and Nerison suffered injuries for which he claims workers' compensation benefits.
Nerison reported his injury to ACT. ACT authorized medical treatment and paid indemnity benefits. In approximately January 2004, ACT stopped paying benefits to Nerison and refused to pay further benefits, including outstanding medical expenses.

7. NERISON FILES SUIT
Nerison filed a petition for benefits in the compensation court in May 2004 and an amended petition on September 7, 2005. In the amended petition, Nerison set forth general allegations about the relationships between the parties and the details of his accident and injury before outlining four theories of liability.
Under the first theory of liability, Nerison alleged that through at least June 19, *28 2002, he was a coemployee of ACT and consequently of AMS, which had a workers' compensation insurance policy with CNA. Nerison alleged that he was therefore entitled to workers' compensation benefits from ACT, AMS, and CNA by virtue of this employment relationship.
Nerison next alleged, as his second theory of liability, that he was a self-employed individual who was essentially paying his own workers' compensation insurance premiums. Nerison stated that he received a certificate evidencing insurance coverage with CNA. Nerison alleged that CNA, AMS, and ACT knew, or should have known, Nerison would rely on the insurance certificate and payment of his premiums and believe he had workers' compensation coverage through CNA and that he was thus entitled to benefits from ACT, AMS, and CNA.
Under his third theory of liability, Nerison alleged that he was a beneficiary to the agreement between ACT and AMS which made independent owner-operators employees of ACT and coemployees of AMS for purposes of workers' compensation coverage. Nerison alleged that AMS breached that agreement in various specified ways and that he was entitled to all contractual remedies that ACT would have had against AMS, including continuation of the coemployment relationship and the right to workers' compensation insurance and benefits from AMS and its insurer, CNA.
Finally, Nerison alleged under his fourth theory of liability that he entrusted and paid premiums to ACT to maintain workers' compensation coverage on his behalf for the time period in which he was paying premiums. Nerison asserted that in the event the court found that CNA and AMS were not obligated to provide workers' compensation benefits to him, ACT was obligated to provide such benefits because of its fiduciary responsibility to Nerison.
Nerison sought a determination of the rights and liabilities of the parties and of his loss of earning capacity; an award of such benefits as he may be entitled to under the Nebraska workers' compensation law, including payment of past and future medical expenses and temporary total and permanent partial disability benefits; and an award of attorney fees.

8. TRIAL COURT PROCEEDINGS AND RULING
Trial was held before a single judge of the compensation court on February 7, 2006, with additional evidence being received on May 30. The trial judge received exhibits which included medical records relating to Nerison's accident and injury, depositions of representatives of the parties, and documentary evidence concerning the relationships between the parties. The judge also heard testimony from Nerison.
The trial judge entered an order of dismissal on January 30, 2007. After outlining the detailed factual background of this case, the judge addressed the question of what jurisdiction, if any, the compensation court had over the various claims set forth in Nerison's amended petition. The judge outlined certain case law and legislative history and concluded that the compensation court in general has jurisdiction to determine the existence of workers' compensation coverage and that accordingly, the court had jurisdiction in this case to decide the claim against CNA.
In considering the merits of Nerison's claim against CNA, the trial judge first reviewed Neb.Rev.Stat. § 48-115(10) (Cum.Supp.2000). The judge stated:
The provision [in § 48-115(10)] for a self-employed person to be eligible for workers' compensation benefits or coverage *29 was added to the Nebraska Workers' Compensation Act, § 48-115[,] in 1984 when the [L]egislature adopted LB776. There is little legislative history but the introducer's statement shows that the individual would have to be engaged in business on a substantially full-time basis and file a written notice of election with the insurer.
In this case, CNA issued a policy of insurance to AMS. ACT was a client of AMS, although the only purpose of being a client was to obtain workers' compensation coverage through AMS, and then through CNA. AMS did not do any payroll for ... Nerison or any other truck owner/operator. One wonders how CNA could determine the premiums due when premiums were based upon payroll and the payroll wasn't done by AMS. The statu[t]e is specific and the statement of the introducer of the legislation is specific in that the insurer must have a written notice of election. In this case, CNA had no notice that ... Nerison was a self-employed truck owner/operator. The appointment of ... Brandert as an attorney or agent to prepare and file any necessary papers is insufficient, especially when ... Brandert failed to supply AMS and/or CNA (National Fire Insurance Company of Hartford) with the necessary notice of election. Finally, and more importantly, the premiums for the month of June 2002 ... were not paid to AMS and/or CNA.
This is an unfortunate case where an individual owner of a business, in this case a truck owner/operator, purchases workers' compensation insurance but due to the failure of so many intermediaries to properly perform their duties[, Nerison] was not covered by CNA for his injuries suffered on June 14, 2002.
The trial judge also addressed whether the court had jurisdiction to decide the claim against AMS or ACT. The judge stated:
The claims against AMS and/or ACT are the equivalent of ... claims against an insurance agent for failure to procure insurance. These claims are not within the jurisdiction of the Nebraska Workers' Compensation Court. The claims have nothing to do with insurance coverages but rather are in the nature of a breach of contracts case and/or negligen[ce]. Cases involving a breach of contract and/or negligence require a jury trial. The Nebraska Workers' Compensation Act does not provide for jury trials. This Court does not have jurisdiction of any claims against ACT or AMS.

9. REVIEW PANEL PROCEEDINGS AND RULING
Nerison filed an application for review on February 7, 2007.
The review panel entered an order of affirmance on review on January 8, 2008. The review panel reviewed the trial judge's findings with respect to § 48-115(10) and agreed that the evidence did not support a conclusion that Nerison or any person or entity on his behalf filed an election for coverage on his behalf with any insurance company. The review panel concluded accordingly that Nerison did not comply with a mandatory requirement to elect to bring himself within the provisions of the Nebraska Workers' Compensation Act.
The review panel then reviewed the trial judge's findings with respect to Nerison's claims against AMS and ACT. The review panel agreed with the trial judge that Neb. Rev.Stat. § 48-161 (Reissue 2004) does not confer jurisdiction on the compensation court to determine claims in equity or causes of action based in negligence. The review panel stated:

*30 The language of § 48-161 regarding "jurisdiction to decide any issue ancillary to the resolution of an employee's right to workers' compensation benefits" has been limited to determination of employment status as between two employers or disputes between two insurance companies regarding "aggravation" versus "recurrence" claims. Even within [Schweitzer v. American Nat. Red Cross, 256 Neb. 350, 591 N.W.2d 524 (1999)], the Supreme Court restated[,] "A statutorily created court, such as the Workers' Compensation Court, has only such authority as has been conferred by statute, and its power cannot extend beyond that expressed in the statute."
The review panel found that the judgment was based on findings of fact which were not clearly wrong and that no error of law appeared. The review panel affirmed the order of dismissal entered by the trial judge. Nerison subsequently perfected his appeal to this court.

III. ASSIGNMENTS OF ERROR
Nerison asserts, consolidated and restated, that the trial judge erred in (1) failing to find him an employee of AMS or ACT and (2) applying § 48-115(10).

IV. STANDARD OF REVIEW
Pursuant to Neb.Rev.Stat. § 48-185 (Reissue 2004), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is no sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. Davis v. Crete Carrier Corp., 274 Neb. 362, 740 N.W.2d 598 (2007). Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. Id. An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. Id.

V. ANALYSIS

1. NERISON'S SECOND, THIRD, AND FOURTH THEORIES OF LIABILITY
The trial judge concluded that the compensation court did not have jurisdiction over Nerison's claims against AMS and ACT. We agree with this conclusion with respect to the second, third, and fourth theories of liability set forth in Nerison's amended petition.
Although, as a statutorily created court, the Workers' Compensation Court is a tribunal of limited and special jurisdiction and has only such authority as has been conferred on it by statute, Zach v. Nebraska State Patrol, 273 Neb. 1, 727 N.W.2d 206 (2007), under § 48-161, the compensation court has "jurisdiction to decide any issue ancillary to the resolution of an employee's right to workers' compensation benefits."

(a) Second Theory of Liability
Nerison's second theory of liability essentially sets forth a negligence claim. In addressing the claim set forth in Nerison's second theory of liability, it will be helpful to review the Nebraska Supreme Court's decision in Schweitzer v. American Nat. Red Cross, 256 Neb. 350, 591 N.W.2d 524 (1999). Rhonda Schweitzer was an emergency health services worker who brought an action in the district court against the American National Red Cross (Red Cross) and the sponsor of a circus. Schweitzer alleged that she was injured *31 while working as a direct employee of the Red Cross when she slipped on stairs while assisting a circus patron. Schweitzer also alleged that she was a statutory employee of the circus sponsor. In her petition, Schweitzer set forth various allegations of negligence, including that the Red Cross and the circus sponsor failed to provide her with workers' compensation insurance coverage. The district court granted summary judgment motions filed by the defendants, finding that Schweitzer's remedies were limited to those available under the Workers' Compensation Act.
On appeal, the Nebraska Supreme Court observed that the act is an employee's exclusive remedy against an employer for an injury arising out of and in the course of employment and stated that "[a]bsent any other allegations, a determination of employee status under the Act is ordinarily sufficient for the district court to end its analysis and dismiss a purported negligence suit." Schweitzer v. American Nat. Red Cross, 256 Neb. at 356, 591 N.W.2d at 529. The Schweitzer court noted Neb.Rev.Stat. § 48-145(3) (Reissue 1993), which provided (as does its current version) that employers who failed to comply with conditions regarding the maintenance of workers' compensation coverage were "`required to respond in damages to an employee for personal injuries.'" 256 Neb. at 357, 591 N.W.2d at 529. The court stated that such damages could be sought in district court. The court stated that assuming Schweitzer had employee status, the resolution of the question of whether the defendants maintained proper insurance was determinative of whether Schweitzer could continue to pursue her negligence action in the district court. Id. The court determined that although the existence of insurance could be decided in the compensation court, such jurisdiction was not exclusive, and that on the facts of Schweitzer's case, the issue should be determined in the district court where the action was filed. Id. Accordingly, the court reversed the district court's determination that it lacked subject matter jurisdiction with respect to the issue of the existence of insurance. Id.
The ruling in Schweitzer illustrates that if an individual is considered an employee of a particular company and if that company has maintained workers' compensation insurance as required under the act, then any "negligence" claims an employee might have for a work-related accident and injury must be brought in the Workers' Compensation Court. An employee cannot normally maintain a negligence suit against his or her employer regarding an injury arising out of and in the course of employment; his or her sole remedy is a claim for workers' compensation. Skinner v. Ogallala Pub. Sch. Dist. No. 1, 262 Neb. 387, 631 N.W.2d 510 (2001). The difficulty in the present case with Nerison's bringing any "negligence" claims in the Workers' Compensation Court is the compensation court's finding that Nerison was a self-employed individual. A basic principle underlying the Nebraska Workers' Compensation Act is that only employees are entitled to workers' compensation benefits. Gebhard v. Dixie Carbonic, 261 Neb. 715, 625 N.W.2d 207 (2001). In this case, rather than finding that Nerison's "negligence" claims were those of an employee against an employer for failure to maintain workers' compensation insurance, the compensation court determined that Nerison's claims against AMS and ACT were the equivalent of claims against an insurance agent for failure to procure insurance.

(b) Third Theory of Liability
In his third theory of liability, Nerison alleged various breaches by AMS of the *32 contract between AMS and ACT and alleged that he was entitled to all contractual remedies of ACT against AMS. See Dawes v. Wittrock Sandblasting & Painting, 266 Neb. 526, 667 N.W.2d 167 (2003) (Nebraska Workers' Compensation Act does not afford compensation court jurisdiction to resolve contractual disputes between employees and third-party insurers), disapproved on other grounds, Kimminau v. Uribe Refuse Serv., 270 Neb. 682, 707 N.W.2d 229 (2005).

(c) Fourth Theory of Liability
Finally, in his fourth theory of liability, Nerison raised an equitable theory. The Workers' Compensation Court does not have general equitable jurisdiction. Dawes v. Wittrock Sandblasting & Painting, supra.

(d) Conclusion
We find that the trial judge did not err in his conclusions with respect to Nerison's second, third, and fourth theories of liability and that the review panel did not err in affirming this portion of the order of dismissal.

2. NERISON'S FIRST THEORY OF LIABILITY
Nerison asserts that the trial judge erred in failing to find him an employee of AMS or ACT and applying § 48-115(10) (concerning self-employed individuals) to bar his claims against CNA. Nerison argues that pursuant to the December 2001 staff leasing agreement, he was considered a coemployee of AMS and ACT for workers' compensation purposes, and, accordingly, that it was error to apply § 48-115(10) to preclude his recovery of benefits.
Nerison's petition contains a judicial admission that he was a self-employed truckdriver. A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for evidence, thereby waiving or dispensing with the production of evidence by conceding for the purpose of litigation that the proposition of fact alleged by the opponent is true. Reicheneker v. Reicheneker, 264 Neb. 682, 651 N.W.2d 224 (2002). Formal acts that may operate as judicial admissions include statements made in pleadings, and the rule of evidence is that matters contained in pleadings are judicial admissions insofar as the adversary is concerned. Ashland-Greenwood Public Schools v. Thorell, 15 Neb.App. 114, 723 N.W.2d 506 (2006). Although Nerison also pled that he was a coemployee of AMS for purposes of workers' compensation coverage, this allegation relates to the causes of action which the compensation court correctly determined it had no jurisdiction to decide.
Section 48-115, among other things, defines the terms "employee" and "worker" for purposes of the Nebraska Workers' Compensation Act. Section 48-115(10) defines those terms to include self-employed people who elect to bring themselves within the provisions of the act and sets forth the requirements for election of coverage under the act by such persons. The version of § 48-115 in effect at the time of Nerison's accident and injury provided as follows:
For purposes of the act, employee or worker shall be construed to mean:
....
(10) Each individual employer ... or self-employed person who is actually engaged in the individual employer's ... or self-employed person's business on a substantially full-time basis who elects to bring himself or herself within the provisions of the Nebraska Workers' Compensation Act. Such election is made if he or she (a) files with his or her current workers' compensation insurer *33 written notice of election to have the same rights as an employee only for purposes of workers' compensation insurance coverage acquired by and for such individual employer ... or self-employed person or (b) gives notice of such election and such insurer collects a premium for such coverage acquired by and for such individual employer ... or self-employed person. This election shall be effective from the date of receipt by the insurer for the current policy and subsequent policies issued by such insurer until such time as such employer ... or self-employed person files a written statement withdrawing such election with the current workers' compensation insurer or until such coverage by such insurer is terminated, whichever occurs first.
(Emphasis supplied.)
There are two additional significant facts supporting the trial judge's determination with respect to Nerison's first theory of liability. First, we note the fact that ACT did not make the required payments to AMS under the December 2001 staff leasing agreement for June and July 2002. Accordingly, Nerison's status as a coemployee of AMS and ACT was in question on the date of his accident. We make no determination as to what effect the coemployee provision in the staff leasing agreement would have had, if any, on the outcome in this case in the event ACT had made the required payments. Second, and perhaps more important, we note that the record shows that the election document signed by Nerison was never forwarded to AMS, let alone CNA, and that by the time of Nerison's accident, AMS was no longer remitting lists of its client companies to CNA. Clearly, from CNA's point of view, there had been no election or other document showing that Nerison was covered as a self-employed individual or as a coemployee of AMS.
The record in this case contains sufficient evidence to support the trial judge's conclusion that Nerison was selfemployed and that Nerison did not comply with § 48-115(10). Section 48-185 precludes an appellate court's substitution of its view of the facts for that of the Workers' Compensation Court if the record contains sufficient evidence to substantiate the factual conclusions reached by the Workers' Compensation Court. Davis v. Goodyear Tire & Rubber Co., 269 Neb. 683, 696 N.W.2d 142 (2005). Accordingly, we find no error with respect to the trial judge's rulings as to Nerison's first theory of liability or with respect to the review panel's affirmance of that portion of the order of dismissal.

VI. CONCLUSION
The review panel did not err in affirming the order of dismissal.
AFFIRMED.